IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Walker D. Miller

Civil Action No.  03-cv-1454-WDM-PAC

COLORADO RIGHT TO LIFE COMMITTEE, INC.,

     Plaintiff,

v.

DONETTA DAVIDSON, in her official capacity as Secretary of State,

     Defendant.

---

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

---

Miller, J.

     This matter is before me on the parties' motions for summary judgment.  Having

considered the parties' motions, stipulated statement of undisputed facts, oral

argument, and supplemental filings, I find that both motions should be granted in part

and denied in part.

     This action revolves around the constitutionality of Article XXVIII of the Colorado

Constitution, a citizen passed campaign finance reform amendment designed to limit

the influence of money on state elections, particularly money from corporations and

special interest groups.[1]  The Article finds and declares that large political contributions

"create the potential for corruption and the appearance of corruption," and, in particular

"that political contributions from corporate treasuries . . . can unfairly influence the

outcome of Colorado elections; and that the interests of the public are best served by

---

[1]A complete copy of Article XXVIII is attached as Appendix A to this opinion.

limiting campaign contributions, encouraging voluntary campaign spending limits,

providing for full and timely disclosure of campaign contributions, independent

expenditures, and funding of electioneering communications . . ."  Art. XXVII, § 1.

As described in Research Publication No. 502-10 and entitled "2002 Ballot

Information Booklet, Analysis of Statewide Ballot Issues and Recommendation on

Retention of Judges," which was mailed to all Colorado voters, the proposed

amendment would regulate political advertisements, require certain disclosures by

individuals and organizations which spent certain amounts on an annual basis for such

advertisements and prohibit corporations and labor unions from directly funding the

regulated political advertisements.[2]

Plaintiff Colorado Right to Life Committee (CRLC), a non-profit advocacy

corporation, fears that enforcement of Article XXVIII will apply to its traditional

communications and activities.  As a consequence it has filed this action seeking

declaratory and injunctive relief against Donetta Davidson, in her official capacity as

Secretary of State (Davidson)[3], arguing that the Article provisions concerning

(1)"electioneering communications"; (2)"Political Committees"; and (3) political

contributions and expenditures by corporations are unconstitutional under the First and

Fourteenth Amendments of the United States Constitution.  In particular, and as

_____

[2]In support of the Amendment the Booklet stated: "Corporations and labor unions are already banned from directly contributing to federal candidates; this proposal simply extends the ban to state races."  *Id.* at p. 6.

[3]Ms. Davidson has resigned and her successor is automatically substituted as a party.  Fed. R. Civ. P. 25(d)(1).

summarized in the pretrial order, CRLC makes the following claims:

1.  Sections 2(7) and 6, dealing with "electioneering and communications" are impermissibly vague and overbroad and cannot be constitutionally applied to CRLC's communications not directly or indirectly advocating the election or defeat of any candidate;

2.  Section 6(2)'s ban on direct corporate funding for electioneering and communications is unconstitutional as applied to CRLC because it is a non-profit ideological corporation that does not engage in business activities and receives only insubstantial or *de minimis* contributions from business corporations;

3.  Section 2(12)'s definition of "political committee" is unconstitutional on its face and as applied to organizations such as CRLC that do not have a major purpose of electing candidates;

4.  Section 3(4)(a)'s ban on corporate contributions and expenditures is unconstitutional as applied to CRLC because the non-profit exemption is too narrow; and

5.  The section 3(4)(a) ban on corporate expenditures is unconstitutional because it is vague and overbroad.

## Background

The parties present no dispute of fact.[4]  CRLC is a nonprofit, ideological,

---

[4]At a March 25, 2005 status conference, in answer to my question, the parties stated that they had agreed upon facts that would dispense with the need for trial, and tendered a Stipulated Statement of Undisputed Facts (Stipulation).  Unless otherwise indicated, the factual background is based on this Stipulation.

3

membership corporation, incorporated in Colorado.  Its purposes, according to its

Articles of Incorporation, are to (1) promote "reverence and respect for human life,

without regard to condition, quality, age, race, religion, creed, or color, whether born or

unborn"; (2) educate the community "to the dangers of abortion, euthanasia, infanticide,

and compulsory sterilization and also to any form of repressive or permissive legislation

which would allow the debasement of man or otherwise weaken or destroy the moral

fibre of the community"; and (3) promote "a favorable spiritual, physical, and cultural

environment consistent with the above purposes."  Ex. A. to complaint.  It has several

chapters throughout the state.

CRLC is tax-exempt under 26 U.S.C. § 501(c)(4)[5] and has a policy of not

contributing to, accepting contributions from, or engaging in express advocacy

regarding, political parties or candidates.  Likewise, it is not associated with any political

candidate, political party, or campaign committee, and is not aware of ever receiving

any donations at the request of, or solicited by, a political candidate, party or elected

official.

CRLC was not established by a business corporation or labor union, and has no

shareholders or other persons affiliated with it that would have a claim on its assets and

earnings.  CRLC has two types of members: (1) contributing members, who include any

one who donates money to the organization, unless that person or entity asks not to be

a member; and (2) voting members, who include any one who supports CRLC's

objectives, indicates a desire to join CRLC, and pays the prescribed dues, unless

---

[5]§501(c)(4) applies to "civic leagues or organizations not organized for profit but
operated exclusively for the promotion of social welfare..."

waived.

CRLC is funded almost exclusively by "membership dues" from individual donors.  In 2001, CRLC had 1,529 donors, including 15 who gave more than $200.  In 2002, CRLC had 2,101 donors, including 19 who gave more than $200.  In 2003, CRLC had 1,333 donors, including 7 who gave more than $200.

CRLC does not have a policy against accepting contributions from business corporations, and it received $50 in corporate contributions in 2001, 2002, and 2003.[6] Its gross revenues for the same years were $121,000, $132,000, and $128,000. Additionally, it participates in a long distance telephone service carrier program in which subscribers may designate it as the recipient of a portion the subscriber's bill.  In 2003, CRLC received $358.30 from its participation.

CRLC also engages in fund-raising activities including the "sale" of baby feet pins and bumper stickers at various public events like the State Fair.  Although there is a suggested donation for the items, they are often given away as well.  CRLC's treasurer gives a "wild estimate" that CRLC received approximately $300 per year from these activities.  Additionally, once, about a decade ago, CRLC sold a portion of its mailing list to a political candidate.

CRLC has not had a political committee or other segregated account since 1986. It has no record of ever receiving donations earmarked for the type of communications at issue in this case.

CRLC seeks to achieve its purposes by communicating with the public regarding

---

[6]CRLC did not receive any contributions from labor unions in any of these years.

its issues, including information about elected officials, and encourages Colorado citizens to communicate with their representatives on these issues.

CRLC publishes a periodic newsletter, entitled "The Colorado LifeLight," approximately every other month.  The newsletter often mentions the names of candidates and their positions on life issues.  It is distributed year round, including within 30 days before the primary and 60 days before the general election.  The newsletter is sent to members, and sometimes new membership "prospects."  The total mailing  approximates 3,000 to 3,500 recipients.

CRLC also maintains a website that contains a section on politics and law. Some of its articles in that section mention candidates and are available to the public year round, including immediately preceding elections.  Additionally, CRLC "might" have placed voter guides on the website in the past.

Although CRLC asserts its general focus is not on political advocacy, in recent election cycles, it has made communications that unambiguously refer to candidates within 30 days before primary elections and 60 days before general elections to inform voters of candidate's views on abortion, on which it has spent over $1000 per year. These communications include voter guides, radio ads and pre-recorded phone messages, and direct-mail and email.  Some historical examples are:

• In July 2000 CRLC sent "Rapid Response Cards," which provided the responses from primary candidates in five districts to a CRLC survey regarding life-related issues, to individuals from those five districts in its mailing list database.[7]  (*Id.* at

---

[7]The parties do not establish whether the database includes just CRLC members or others as well.

82-87.)  In the September newsletter, CRLC noted that in all five pro-life candidates had won and expressed confidence that "the cards had an impact" on the election results. CRLC spent $200 on this effort.

• Before the primaries and general elections in 2000, CRLC circulated the results of its 2000 Candidate Questionnaire which provided the responses of some candidates to a variety of abortion and life-related issues.

• In August 2002, CRLC arranged for a pre-recorded phone call made to identified pro-life supporters in Morgan County before a primary election in which Jack Darnell and Greg Brophy were running.  The message compared the views of the two candidates on abortion, and asked the recipient to urge Darnell to "abandon his pro-abortion views" and to "thank" Brophy for defending unborn children.  CRLC spent $335 on this activity.

• At the same time, CRLC, in partnership with the Christian Coalition, sent form letters to registered pro-life voters in House District 55 comparing the two candidates views on abortion, and asked recipients, when voting in the election, to help stop Gayle Berry's abortion agenda, as well as urging recipients to "thank" Bjorklund for being pro-life. (*See also* Pl.'s Mem. Supp. Summ. J. Mot., Ex. A-18.)  CRLC spent $207 on this letter.

• In August 2002, CRLC published The Colorado Lifelight, with a subtitle "Special Report–2002 Voter Guide."  Although the front page was devoted to general information, the remainder of the publication reported the responses of 42 candidates for state or federal office to a CRLC questionnaire on life-related issues.  In the

7

October/November 2002 Colorado Lifelight, CRLC urged recipients to vote no on three ballot amendments, and published a list of Colorado candidates who had been endorsed by the National Abortion Rights Action League.

    • In the 2002 general election, CRLC ran a radio ad comparing the abortion views of Fourth Congressional District candidates Stan Matsunaka and Marilyn Musgrave, which was broadcast on Denver and Longmont stations.  (Curtis Dep., 30-33.)  Around that same time, CRLC also ran other radio ads encouraging people in his district to call Matsunaka and ask him to pass the Born Alive Infant Protection Act out of his state senate committee.

## Standard of Review

    Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The nonmoving party must set forth facts showing that there is a genuine issue for trial.  The court views the record in the light most favorable, and draws reasonable inferences therefrom, in the light most favorable to the party opposing the summary judgment motion.  *Cummings v. Norton* ,393 F.3d 1186, 1189 (10th Cir. 2005).  A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). There is no genuine issue of material fact and the cross motions may be decided as a matter of law.

## Discussion

    Some preliminary matters need to be addressed.  First, the parties dispute who

8

bears the burden of proof.  In general, a legislative enactment, including one resulting

from a ballot initiative, is presumed to be constitutional unless shown otherwise.

*Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 636 (10th Cir. 1998).  Thus, without

more, the burden rests on CRLC.  However, "when a law infringes on the exercise of

First Amendment rights, its proponent bears the burden of establishing its

constitutionality."  *ACORN v. Golden*, 744 F.2d 739, 746 (10th Cir. 1984).  *See also*

*Citizens for Resp. Gov't State PAC v. Davidson*, 236 F.3d 1174, 1198 (10th Cir. 2000)

(*quoting Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994)) ("[w]hen the

Government defends a regulation on speech as a means to ... prevent anticipated

harms, it must do more than simply posit the existence of the disease sought to be

cured").  Thus, to the extent CRLC demonstrates that Article XXVIII burdens its First

Amendment rights, Davidson bears the burden of establishing its constitutionality.  *See*

*id.*

On the other hand, CRLC also presents several facial constitutional challenges

to Article XXVIII and in these challenges bears the "heavy burden" of demonstrating a

substantial risk that application of the provision will lead to the suppression of speech.

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998). *See also McConnell*

*v. FEC*, 540 U.S. 93, 207 (2003) ("We are therefore not persuaded that plaintiffs have

carried their heavy burden of proving that amended FEC § 316(b)(2) is overbroad");

*Faustin v. City & County of Denver*, 268 F.3d 942, 948 (10th Cir. 2001) (to prevail on a

facial attack, the plaintiff must demonstrate challenged law's invalidity).

To the extent that CRLC argues facial unconstitutionality,[8] I may conclude any

section is unconstitutionally vague on its face only if it is impermissibly vague in all its

applications.  *Ward v. Utah*, 398 F.3d 1239, 1251 (10th Cir. 2005).  *See also Hill v.*

*Colorado,* 530 U.S. 703, 733 ("speculation about possible vagueness in hypothetical

situations not before the court will not support a facial attack on a statute when it is

surely valid in the vast majority of its intended applications.")

To the extent CRLC asserts both facial and as applied challenges, the burden

will vary.

Secondly, in reviewing these challenges to the Article, I should rule as narrowly

as possible on the facts before me.  *Citizens for Resp. Gov't State PAC* , 236 F.3d at

1193; *see Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501 (1985) (cardinal rule

"governing the federal courts" is "never to formulate a rule of constitutional law broader

---

[8]CRLC appears to argue that, because it generally has communications that might be regulated by Article 28, it is not asserting any facial claims.  (*See* Pl.'s Resp. Def.'s Mot. Summ. J., at 4.)  It relies on *Anderson v. Spear*, 356 F.3d 651, 664-65 (6th Cir. 2004), where a "write-in" candidate who wished to stand near polls to provide voters with instructions as to how to write in a candidate challenged the constitutionality of a state statute prohibiting "electioneering" within 500 feet of a polling place.  The *Anderson* court found that "electioneering" was so broad as to encompass both express and issue advocacy, and because the state had not provided evidence supporting the regulation of both types of advocacy, held that the statute was invalid without a limiting instruction.  Therefore, the *Anderson* court apparently placed the burden on the state.

Nonetheless, some of CRLC's claims are distinguishable from those in *Anderson.* In that case, the plaintiff established that the law prohibited him from undertaking specific conduct, and therefore the state bore the burden of demonstrating the statute's validity. Thus, to the extent CRLC argues that Article 28 limits or potentially limits a specific communication or type of communication that it regularly makes or intends to make, i.e., to the extent it establishes a burden on its expression, Davidson bears the burden of demonstrating the validity of the provision at issue.  However, to the extent CRLC makes general over breadth or vagueness arguments, or relies on hypothetical circumstances, its arguments are more properly viewed as facial challenges, and CRLC bears the burden of demonstrating that Article 28's invalidity.  *See McConnell*, 540 U.S. at 207.

than is required by the precise facts to which it is to be applied").

These considerations militate toward commencing analysis with CRLC's assertion that Article XXVIII's regulations are unconstitutional as applied to it as an ideological corporation under the recognized exception of *FEC v. Massachusetts Citizens for Life, Inc.*, (*MCFL*), 479 U.S. 238 (1986).

A.     *MCFL* Exception

CRLC first argues that, under *MCFL,* Section 6(2)'s ban on direct corporate funding of electioneering communications is unconstitutional as applied to a ideological corporation such as itself that receives *de minimis* corporate funding and engages in minimal business activity.  Davidson responds that CRLC does not meet the necessary requirements to be exempt under *MCFL*, and that it may therefore be prohibited from directly funding electioneering communications.

Article XXVIII generally defines "electioneering communications" as "any communication broadcasted by television or radio, printed in a newspaper or on a billboard, directly mailed or delivered by hand to personal residences or otherwise distributed" that (I) unambiguously refers to any candidate; (II) is broadcasted, etc., thirty days before a primary election or sixty days before a general election, and (III) is broadcasted to, etc., an audience that includes members of the electorate for such public office.  Art. XXVIII, § 2(7)(a).  However, excluded from the definition are

> (I) Any news articles, editorial endorsements, opinion or commentary
> writings, or letters to the editor printed in a newspaper, magazine or other
> periodical not owned or controlled by a candidate or political party; (II) Any
> editorial endorsements or opinions aired by a broadcast facility not owned
> or controlled by a candidate or political party; (III) Any communication by
> persons made in the regular course and scope of their business or any

> communication made by a membership organization solely to members of
> such organization and their families; and (IV) Any communication that
> refers to any candidate only as part of the popular name of a bill or
> statute.

Colo. Const. Art XXVIII, § 2(7)(b).

Section 6(2) prohibits a corporation or labor organization from funding electioneering communications unless done through a political committee or small donor committee established by that corporation or labor organization. *Id.*, § 6(2).

Similarly, Section 3(4)(a) makes it unlawful for a corporation or legal organization to contribute to a candidate committee or a political party or "to make expenditures expressly advocating the election or defeat of a candidate" except by means of certain political or small donor committees. Art. XXVIII; § 3(4)(a).

As opposed to Section 6's proscription, however, Section 3 provides an exception for a corporation that:

> (1) Is formed for the purpose of promoting political ideas and cannot
> engage in business activities; and

> (2) Has no shareholders or other persons with a claim on its assets
> or income; and

> (3) Was not established by and does not accept contributions from
> business corporations or labor organizations.

Art. XXVIII, § 3(4)(b).

With regard to this section, CRLC argues that it is not covered because it either meets the exemption standards or the exemption has been improperly narrowed to render it unconstitutional under the *MCFL* standards as applied to CRLC. Davidson argues the opposite, namely, CRLC does not meet the precise standards of the

exception and is therefore prohibited from contributions or expenditures.

In *MCFL*, the Supreme Court addressed § 441b(a) of the Federal Election Campaign Act (FECA), a similar campaign finance reform provision that allowed corporations to engage in express advocacy in connection with any federal election only through a separate segregated fund.  479 U.S. at 248-49.  The Court held that § 441b(a) could not be applied to MCFL, the plaintiff corporation, because it was "not the type of traditional corporation organized for economic gain that has been the focus of regulation of corporate political activity."  *Id.* at 259.  In particular, MCFL (1) "was formed for the express purpose of promoting political ideas, and cannot engage in business activities"; (2) "has no shareholders or other persons affiliated so as to have a claim on its assets or earnings"; and (3) "was not established by a business corporation or a labor union, and it is its policy not to accept contributions from such entities."  *Id.* at 264. The Court found these three characteristics "essential to its holding."  *Id.*

Consequently, under *MCFL*, the government may not regulate the direct political expenditures of a corporation that shares the three characteristics of MCFL ("an *MCFL* organization").  However, Davidson takes the analysis a step farther and argues that because the *MCFL* Court deemed the characteristics "essential," the Court created a bright line allowing the government to regulate the political expenditures of any corporation as long as it does not share the precise *MCFL* characteristics.  Thus, she argues, Colorado may prohibit direct political expenditures by an advocacy corporation such as CRLC if it accepts *de minimis* corporate contributions.

As a preliminary matter, and as opposed to Section 3(4)(b), Section 6(2) does

not explicitly exclude *MCFL* organizations from its coverage, the failure to do which is clearly a constitutional defect.  However, Davidson argues that I should, as did the Supreme Court in *McConnell* under similar circumstances, construe Section 6 as excluding *MCFL* organizations.  *See* 540 U.S. at 211.  Additionally, Davidson has promulgated Rule 4.14, which explicitly excludes *MCFL* organizations from Section 6(2)'s reach.  Based on both the similarity between this case and *McConnell* and Davidson's promulgation of Rule 4.14, I agree with Davidson and apply a narrowing construction to exclude *MCFL* organizations from Section 6(2)'s reach.

However, even accepting this narrowing construction, CRLC argues that the Supreme Court has never examined the scope of the *MCFL* exemption, and that the state may not permissibly regulate nonprofit ideological corporations, such as itself, that are very similar to an *MCFL* organization, but that do not precisely share all of the *MCFL* features.  In particular, it argues that because it was formed to promote its ideology and because it receives very little funding from for-profit corporations, "the concerns underlying the regulation of corporate political activity are simply absent."  *See MCFL*, 479 U.S. at 263.

The four courts of appeal that have addressed this issue agree and interpret *MCFL* to protect non-profit advocacy corporations that accept *de minimis* corporate funding.  *See FEC v. Nat'l Rifle Assoc. of Am.*, 191-83 (D.C. Cir. 2001); *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 713-14 (4th Cir. 1999); *FEC v. Survival Educ. Fund, Ind.*, 65 F.3d 285, 292 (2d Cir. 1995); *Day v. Holahan*, 34 F.3d 1356 (8th Cir. 1994).  However, Davidson argues that in *McConnell*, the Court implicitly rejected

14

these lower courts' interpretations.

In *McConnell*, the Court addressed whether a provision prohibiting not-for-profit corporations from paying for "electioneering communications"[9] with general treasury funds was unconstitutional.  540 U.S. at 210.  After construing the provision to exempt *MCFL* organizations from its purview, the Court denied the constitutional challenge, holding that "[a]s so construed, the provision is plainly valid."  *Id.* at 211.  *See also FEC v. Beaumont*, 539 U.S. 146, 163 (2003) (finding ban on direct contributions by corporation as applied to advocacy corporation was valid).

Although *McConnell* provides that the exclusion of *MCFL* organizations from the coverage of a statute regulating political expenditures will defeat a facial challenge, it did not address an as-applied challenge.  The Supreme Court has generally rejected the use of bright line tests in this context.  *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 359 (1997) ("[n]o bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms").  I disagree that *McConnell* provides any indication that, in the context of an as-applied challenge, *MCFL* created a bright line constitutional test "for when a nonprofit

_____

[9]As defined by the Bipartisan Campaign Reform Act (BCRA), the statute at issue in *McConnell,* "electioneering communications" are defined as any "broadcast, cable , or satellite communication" that "(I) refers to a clearly identified candidate for Federal office; (II) is made within (aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or (bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and (III) in the case of a communication that refers to a candidate other than President or Vice President, is targeted to the relevant electorate."  *McConnell*, 540 U.S. at 189-90 (*quoting* 2 U.S.C. § 434(f)(3)(A)(i) (Supp. 2003)).  Under BCRA, a communication is "targeted to the relevant electorate" if it "can be received by 50,000 or more persons" in the district or State the candidate seeks to represent.  *Id.* (*quoting* 2 U.S.C. § 434(f)(3)(C).

corporation must be exempt;'" rather, I view *MCFL* as "'an application, in three parts, of First Amendment jurisprudence to the facts in *MCFL*.'" *Bartlett*, 168 F.3d at 714 (*quoting Day*, 34 F.3d at 1363)).

Consequently, the "crucial question is not whether [CRLC] has a policy against accepting corporate contributions, but whether its acceptance of those contributions means that it is serving as a conduit 'for the type of direct spending by for-profit corporations that creates a threat to the political marketplace.'" *Id.* (*quoting MCFL*, 479 U.S. at 264).  *See also Nat'l Rifle Assoc.*, 254 F.3d at 192 ("[l]ike our sister circuits, we therefore focus not on the absence of a policy against corporate contributions, but on whether such contributions could have turned the NRA into a potential conduit for corporate funding of political activity"); *FEC v. Survival Educ. Fund, Inc.*, 65 F.3d 285, 293 (2d Cir. 1995) ("a nonprofit political advocacy corporation, which in fact receives no significant funding from unions or business corporations, does not surrender its First Amendment freedoms for the want of such a policy [against accepting corporate contributions]").

Based on the stipulated facts before me, I find that CRLC cannot be viewed as a potential conduit for for-profit corporate funding of political activity.  Rather, CRLC closely resembles the plaintiff corporation in *MCFL*: both are nonprofit, non-stock corporations sharing very similar purposes, advocacy activities, and funding mechanisms, including voluntary donations from members and informal fund-raising "sales," such as bake sales, in the case of MCFL or, baby feet pin sales in the case of CRLC.  *See* 479 U.S. at 241-43.  In fact, the only relevant difference between the two is

16

that CRLC receives approximately $50 of corporate funding per year.[10]  Both as a

percentage of its gross income (significantly less than 1%) and an absolute number, this

amount of corporate funding could not "have turned [CRLC] into a potential conduit for

corporate funding of political activity."  *See Nat'l Rifle Assoc.*, 254 F.3d at 192.

Davidson relies on *Beaumont*, a more recent Supreme Court case, in which the

Court noted that "concerns about the corrupting potential underlying the corporate ban

may be implicated by advocacy corporations, which, like their for-profit counterparts,

benefit from state-created advantages and may be able to amass substantial political

war chests." *Beaumont*, 539 U.S. at 147.[11]  *Beaumont*, however, dealt with corporate

contributions, not direct expenditures.  *See id.* at 164 (Kennedy, J., concurring) (*MCFL*

"contains language supporting the Court's holding here that corporate contributions can

be regulated more closely than corporate expenditures").  *MCFL* remains the controlling

case, and as discussed above, the similitude between MCFL and CRLC indicates that

Colorado does not have a sufficiently compelling interest in regulating the political

expenditures of advocacy corporations such as CRLC.

_____

[10]I do not view CRLC's participation in the long-distance phone program as a corporate contribution relevant to the *MCFL* analysis.  *See Bartlett*, 168 F.3d at 714 ("while these contributions may technically come from the phone company, they in fact result from the decisions of the individual phone company customers").  However, even if they were corporate contributions, they are likewise *de minimis*.  For instance, even including the income from this program, in 2003 CRLC's total revenues from corporate contributions would be approximately $400, or approximately .3% of its total revenues of $121,000.

Additionally, I, like the *MCFL* Court, do not view CRLC's fundraising "sales" as "business activity."  *See* 479 U.S. at 241-43.

[11]As an example, Davidson notes that CRLC "routinely makes use of its bulk postage rate."  (Def.'s Resp. Pl's Mot. Summ. J., at 15.)  This example is off target because an entity need not be a corporation to qualify for a bulk-postage rate.

Nor, for that matter, can it be said that CRLC has amassed a "substantial political war chest," warranting state regulation of its political expenditures.  *See Beaumont*, 539 U.S. at 147.  Rather, on the record before me, CRLC only irregularly involves itself in politics, and allocates a small percentage of its expenditures on political communications.

Consequently, I find that Davidson has not demonstrated that Section 6(2)'s infringement upon CRLC's protected speech is supported by a compelling justification. *See MCFL*, 479 U.S. at 630.  Accordingly, CRLC has demonstrated that, as a matter of law, it is entitled to an exemption under *MCFL* and that Section 6(2)'s ban on corporate funding may not constitutionally be applied to it.  For the same reasons, Section 3(4)(a), to the extent it proscribes a corporation from making "expenditures expressly advocating the election or defeat of a candidate" except through a political committee,[12] is unconstitutional as applied to CRLC.[13]  *See id.*  Based on these determinations, I do not address CRLC's claims that Section 6(2) and Section 3(4)(a) are impermissibly vague and overbroad.

B.      Disclosure Requirements

CRLC likewise claims the reporting requirements of Section 6(1) are unconstitutionally vague and overbroad and cannot be constitutionally applied to it.

---

[12]Section 3(4) also makes it unlawful for a corporation to make contributions to a candidate committee or a political party, which may be constitutional under *Beaumont*. However, I need not decide this question, as CRLC does not make political contributions, and therefore does not have standing to object to this proscription.  (*See* Stip., ¶ 7.)

[13]The failure of section 3(4)(a)'s exclusions to encompass an advocacy corporation with *de minimis* corporate funding renders it too narrow.

Under Section 6(1), any "person"[14] who expends more than $1000 or more per calendar year on "electioneering communications" must file reports at set times with the Secretary of State disclosing (1) spending on such electioneering communications, and (2) "the name and address of any person that contributes more than two hundred and fifty dollars per year to such person described in this section for an electioneering communication," and if the contributor is a natural person, "such reports shall also include the occupation and employer of such natural person."  Colo. Const. art. XXVIII, § 6(1).

Because Section 6(1) imposes disclosure requirements, which may "seriously infringe on privacy of association and belief guaranteed by the First Amendment," it must meet exacting scrutiny.  *Buckley v. Valeo*, 424 U.S. 1, 64 (1976).  Specifically, it must support an important state interest, and there must be a "substantial relation between the governmental interest and the information required to be disclosed."  *Id.*

Davidson argues that Section 6(1) is justified by Colorado's "substantial and important interests in providing the electorate with information, deterring actual corruption and avoiding any appearance thereof and gathering the data necessary to enforce the more substantive electioneering restrictions."  (Def.'s Mem. Supp. Mot. Summ. J., at 16, *quoting McConnell*, 540 U.S. at 196).  CRLC does not dispute that Section 6(1) furthers these interests, but argues that it improperly covers some communications directed in large part to persons outside the relevant electorate,

---

[14]Article 28 defines a person as "any natural person, partnership, committee, association, corporation, labor organization, political party, or other organization or group of persons."  Colo. Const. art. XXVIII, § 2(11).

regulation of which does not advance the state's interests.  For instance, CRLC asserts, without citation to Fed. R. Civ. P. 56(e) evidence, that disclosures would be required of CRLC's newsletters even though they "would not reach more than a few dozen members of most local electorates".  (*See* Pl.'s Resp. Def.'s Mot. Summ. J., at 13.) Likewise, CRLC argues that, in the hypothetical situation where a "Denver flyer that discusses a Pueblo mayoral candidate" is communicated to Pueblo tourists in Denver, Article 28 would inappropriately apply to the flyer.

CRLC provides no details with regards to its distribution of such materials; for instance, there is no evidence that it ever has published a Denver flyer that discusses a Pueblo mayoral candidate, nor does CRLC provide any record allowing me to determine that past newsletters that would constitute electioneering communications regarding a particular candidate were widely distributed outside the relevant electorate.[15]

It is not proper for me to make the assumptions that CRLC requests in the context of an as applied challenge, and therefore I treat CRLC's argument as a facial overbreadth challenge.  As a result, it bears a heavy burden of demonstrating that the application to protected speech is substantial, "not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications."  *McConnell*, 540 U.S. at 207 (*quoting Virginia v. Hicks*, 539 U.S. 113, 120 (2003)). *See also Hicks*, 539 U.S. at 122 (2003) (*quoting New York State Club Assn., Inc. v. City of New York*, 487 U.S. 1, 14 (1988)) ("[t]he over breadth claimant bears the burden of demonstrating from the text

_____

[15]Indeed, there is no evidence in the record, other than an approximate total number, regarding the distribution of CRLC's newsletter.

of the law and from actual fact that substantial over breadth exists").

CRLC makes no showing regarding the ratio of Section 6(1)'s application to protected and unprotected speech. Indeed, CRLC does not deny that Article 28 permissibly regulates some electioneering communications, and admits that "a well-crafted statute might have legitimately regulated some of [its] past communications." (Pl.'s Resp., at 4.)[16] Likewise, CRLC's scattered list of hypothetical communications falling outside Article XXVIII's legitimate scope that might be regulated as electioneering communications, ranging from wedding invitations to congressional directories (which likely would be excluded from Section 6(1)'s coverage by its $1000 threshold) is not sufficient to demonstrate over breadth. A statute may not be invalidated simply "because some persons' arguably protected conduct may or may not be caught or chilled by the statute." *Broadrick v. Oklahoma*, 413 U.S. 601, 618 (1973). Consequently, on the record before me, CRLC has not established that Section 6(1)'s application to protected speech is substantial, and thus its overbreadth argument fails.[17]

---

[16]The parties also address whether the $1,000 threshold for requiring disclosures under Section 6 is appropriately tailored. CRLC asserts that distribution of one of its newsletters would cost more than $1,000 to send to all statewide recipients, yet would only reach "typically" 50-60 households in a state representative's district. (Pl.'s Resp. Mot. Summ. J., at 4, *citing* Def.'s Ex. A-31, at ¶ 4.) This assertion is not supported by CRLC's citation to the record, and is not included in the Stipulation.

[17]Furthermore, a requirement that the names of contributors be disclosed, like that in Section 6(1), is not subject to a facial attack. *McConnell*, 540 U.S. at 197 ("[t]he District Court was also correct that *Buckley* forecloses a facial attack on the new provision in § 304 that requires disclosure of the names of persons contributing $1,000 or more to segregated funds or individuals that spend more than $10,000 in a calendar year on electioneering communications"). Rather, CRLC must provide evidence showing "a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Id.* (*quoting Buckley*, 424 U.S. at 74.) It does

CRLC next argues that the exclusions in Article 28's definition of "electioneering communication" render it unconstitutionally vague.  In particular, CRLC argues that it is impossible to determine exactly what types of communications would be excluded as being "made in the regular course and scope of [person's] business" [hereinafter, the "business exclusion"]or what constitutes an "other periodical" [hereinafter, the "periodical exclusion"].  *See* Colo. Const. art. XXVIII, § 7(b)(I) & (III).

Under the First and Fourteenth Amendments, "speakers are protected from arbitrary and discriminatory enforcement of vague standards."  *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998).  A statute is impermissibly vague if it (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits;" or (2) "it authorizes or even encourages arbitrary and discriminatory enforcement."  *Hill,* 530 at 730 (2000).  *See also City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (even "if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests").    However, where, as here, a party is seeking a declaratory judgment with no pending enforcement against it, I may find Section 2(12) unconstitutionally vague on its face only if it is impermissibly vague in all of its applications.  *Ward v. Utah*, 398 F.3d 1239, 1251 (10th Cir. 2005).  *See also Hill*, 530 U.S. at 733 ("speculation about possible vagueness in hypothetical situations not

not do so.

before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications").

CRLC has not argued, and therefore has not demonstrated, that Article XXVIII's definition of electioneering communications impermissibly vague in all of its applications.  Indeed, for most applications, the statute provides explicit standards for those who apply them, and gives the person of ordinary intelligence a reasonable opportunity to avoid them.  *McConnell*, 540 U.S. at 170 n.64 (*quoting Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972)).[18]

For instance, the business exclusion, in light of Article XXVIII's purpose, is reasonably interpreted to generally exclude regularly-made communications that have nothing to do with an election, including CRLC's hypothetical examples such as staff directories, letterhead, legal pleadings, and correspondence related to a for-profit corporation's business.  *See Hill*, 530 U.S. at 733 (rejecting vagueness challenge when "it is clear what the ordinance as a whole prohibits").[19]

The periodical exception is likewise not vague as a whole: although there are

---

[18]In *McConnell*, the Court addressed a challenge to BCRA's definition of "federal election activity," which expressly includes any "public communication that refers to a clearly identified candidate for Federal office...and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate)." *See* 2 U.S.C. § 431(20)(A)(iii).  The Court rejected an argument that § 431(20)(A)(iii) was unconstitutionally vague, noting that the words provided "explicit standards for those who apply them" and "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited."  *McConnell*, 540 U.S. at 170 n. 64.

[19]A good example is that an Administrative Law Judge recently interpreted the business exclusion to find that polling activities by a professional pollster and a voter education organization did not constitute electioneering communications.  (Jt. Mot. Leave File Suppl. Auth., Ex. 2.)

23

applications on the fringe for which it is not clear whether communications would be

excluded, for the most part, a person of ordinary intelligence understands what

communications constitute "news articles, editorial endorsements, opinion or

commentary writings, or letters to the editor printed in a newspaper, magazine or other

periodical not owned or controlled by a candidate or political party."  Colo. Const. Art.

XXVIII, § 2(7)(b)(I).  Accordingly, CRLC has not met its heavy burdens of demonstrating

that Section 6(1) is invalid as overbroad or unconstitutionally vague in scope.

CRLC also raises several as-applied challenges to Article XXVIII's regulation of

electioneering communications, including the disclosure requirements.  CRLC first

argues that Article XXVIII cannot be applied to communications funded by its internal

501(c)(3) fund, the Colorado Right to Life Committee Education Fund (CRLCEF),

because the fund is already prohibited by federal law from intervening in "any political

campaign on behalf of (or in opposition to) any candidate for public office."  *See* 26

U.S.C. § 501(c)(3).  CRLC "uses the § 501(c)(3) funds for its communications," such as

banquet programs mention political candidates as speakers or persons whom have

helped sponsor the banquet, and argues that such communications should be protected

from regulation.  (Pl.'s Reply, at 9; Pl.'s Mot. Summ. J., at 16.)  Davidson responds that

CRLCEF is not a party to the case, and that CRLC, a 501(c)(4) organization, has no

standing to assert CRLCEF's interests.

I agree with Davidson.  Standing requires that the plaintiff show an actual injury,

a causal connection between the injury complained of, and redressibility.  *Horstkoetter*

*v. Dept.of Public Safety* 159 F.3d 1265, 1279 (10th Cir. 1998).  Section 6(1) requires

that "any person who expends one thousand dollars or more per calendar year on electioneering communications" make certain disclosures.  Therefore it regulates the funding, and not the making, of electioneering communications.

Here, CRLC does not make clear its asserted injury–it does not indicate how requiring CRLCEF to make the disclosures required by Section 6(1) causes CRLC–which is not funding the communications–actual injury.[20]  Consequently, CRLC may not raise an as-applied challenge to communications funded by CRLCEF.

Next, CRLC argues that its "non-advocative" voter guides, that provide recipients with candidates' views on abortion and life-related issues, do not trigger Colorado's legitimate interest.  CRLC asserts that Colorado's legitimate interest in regulating electioneering communications extends only to the extent such communications are the "functional equivalent of advocacy," and that because its guides merely describe candidate's positions on the issue, they do not meet this description.  Davidson argues that I should avoid this attempt to require an "influencing" test, which she claims will simply revive the "magic words" test rejected by *McConnell*.

*McConnell* seems to indicate that, at least where, as here, the proponent of a regulation seeks to justify the regulation based on findings of prior Supreme Court cases, that the regulated communication must constitute an attempt to influence elections.  *See McConnell*, 540 U.S. at 206 (finding that the justifications for the regulation of express advocacy apply equally to electioneering communications as defined under the BCRA that were the functional equivalent of express advocacy).  At

---

[20]Likewise, because CRLCEF is a trust, and not a corporation, Section 6(2)'s prohibition on funding of electioneering communications does not apply.

least, *McConnell* supports the proposition that a state has a "compelling" interest (which is more than what is required for a disclosure requirement) supporting regulation of ads that "are intended to influence the voters' decisions and have that effect." *Id.*

Assuming such a finding is required, I disagree that CRLC's voter guides fall outside Colorado's legitimate interests, because the voter guides clearly "are intended to influence the voters decisions." *Id.* First, the voter guides are targeted at individuals whom CRLC has identified as likely to support its causes. The guides are included in its newsletters, which are sent to contributing and supporting members, as well as to people who have signed petitions circulated by CRLC chapters or at the March of Life. (Hochevar Dep., at 28.) Furthermore, the voter guides are distributed immediately before the primary and general elections, (Compl., ¶ 18; Def.'s Exs. A-14 & A-15), indicating that they are "specifically intended to affect election results." *See McConnell*, 540 U.S. at 127. Finally, on at least one occasion CRLC boasted in its newsletter that its "Rapid Response Cards", which contained a condensed version of similar information, "had an impact" on the results of a primary election. (Stip., ¶ 44.) Under these circumstances, it cannot be said, as CRLC argues, that the guides simply "present candidates' positions on issues without promoting a specific candidate or position." (Pl.'s Mem. Supp. Mot. Summ. J., at 17.) Rather, they are clear attempts to promote the election of those candidates who agree with CRLC's positions on certain issues, and there is evidence that CRLC believes it had that effect. Consequently, regulation of these communications forwards an important, if not a compelling, state interest.

I conclude that both CRLC's purported as-applied challenges[21] and facial challenges fail.  As a result, Davidson had demonstrated that she is entitled to judgment as a matter of law regarding CRLC's challenges to the disclosure requirements of Section 6(1).

C.      Political Committees

CRLC's challenge to Article XXVIII's regulation of "political committees" is both facial and as applied to CRLC because it does not have a major purpose of electing or nominating candidates.[22]  Article XXVIII defines a political committee as "any person, other than a natural person, or any group of two or more persons, including natural persons that have accepted or made contributions or expenditures in excess of $200 to support or oppose the nomination or election of one or more candidates."  Colo. Const. Art. XXVIII, § 2(12)(a).  Political committees are prohibited from accepting contributions or dues from any person in excess of five hundred dollars per house of representatives election cycle.  Colo. Const. art. XXVIII, § 3(5).  Additionally, a political committee must register with the state, and report its contributions received, including the name and address of each donor contributing more than $20, and the name, address, occupation, and employer, of each donor contributing more than $100.  Colo. Rev. Stat. § 1-45-

---

[21]As noted above, CRLC labels its argument that Section 6 is invalid as applied to communications distributed predominately outside a candidate's district an "as applied" challenge.  (Pl.'s Mem. Supp. Mot. Summ. J., at 16.)  Again, because CRLC CRLC provides no record supporting its argument, but relies upon hypothetical scenarios and requires me to make assumptions, I treat this argument as a facial challenge.

[22]It is not clear whether the facts presented would expose CRLC to "political committee" regulation.  For purposes of this opinion I will assume so and rule on an-applied basis.

108(1)(a)(I), 108(1)(a)(II), & 108(3).

CRLC argues that the political committee definition unconstitutionally applies to corporations such as itself whose major purpose is not to elect candidates. *Buckley* establishes that regulation should be tied to groups controlled by candidates or which have a "major purpose" of electing candidates. *See Buckley*, 424 U.S. at 79-80 (noting that requiring disclosures of expenditures of groups that are not under the control of a candidate or do not have the major purpose of achieving the nomination or election of a candidate "may be too remote" to the purposes of FECA).

In response, Davidson appears to first argue that such regulation is authorized under *McConnell*, because *McConnell* held that "issue advocacy is not a constitutional barrier to campaign finance regulation." (Def.'s Resp. Pl.'s Mot. Summ. J., at 20.) However, Davidson overstates *McConnell*'s holding: it certainly does not stand for the proposition that the government necessarily has a legitimate interest in regulating issue advocacy. *See McConnell*, 540 U.S. at 207 (rejecting over breadth challenge on grounds that "[f]ar from establishing that BCRA's application to pure issue ads is substantial, either in an absolute sense or relative to its application to election-related advertising, the record strongly supports the contrary conclusion"). Rather, as discussed above, under *McConnell*, if the government wishes to justify a regulation of corporate political activity under prior Supreme Court precedent authorizing bans on direct corporate electioneering, it must demonstrate that the regulated activity is "the functional equivalent of express advocacy." *Id.* at 206.

At any rate, because regulating an entity as a political committee creates

disclosure obligations, the dispositive question remains whether Article XXVIII's regulation of political committees supports an important state interest, and whether there is a "substantial relation between the governmental interest and the information required to be disclosed." *See Buckley*, 424 U.S. at 64.  Davidson provides no argument or evidence regarding whether Colorado's regulation of political committees meets this level of scrutiny.

However, she does, as an alternate argument, concede that I may construe Section 2(12) as including the requirement that a "person" have the major purpose of electing or nominating a candidate before being regarded as a "political committee." (Def.'s Mot. J. Pleadings, at 18.)  Arguably, incorporating this major purpose test would allow her to rely on the justifications found sufficient in *Buckley* and excuse her failure to provide any other justification for the regulation.  The question then becomes whether I may apply such a narrowing construction under these circumstances.

A federal court must uphold a statute if it is "readily susceptible to a narrowing construction that would make it constitutional." *Davidson*, 236 F.3d at 1194 (*quoting Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988)).  However, "the key to application of this principal is that the statute must be readily susceptible to the limitation; we will not rewrite a state law to conform it to constitutional requirements." *Id.*

Here, Section 2(12) is not readily susceptible to Davidson's proposed narrowing construction.  Under Section 2(12), a person becomes a political committee when it accepts or makes contributions or expenditures in excess of $200 to support or oppose the nomination or election of one or more candidates.  Colo. Const. art. XXVIII, §

2(12)(a).  This "trigger" is incompatible with a major purpose test.  As drafted, Section 2(12) designates a person as a political committee upon expenditure or acceptance of $200 in support of a candidate, regardless of the relationship between $200 and the total expenditures and/or revenues of the person.  Consequently, an entity that spends $200,000 on various non-political activities and donates $200 (1/10 of 1% of its budget) to a candidate is deemed a political committee.  Furthermore, the amount of money an organization must accept or spend–$200–is not substantial and would, as a matter of common sense, operate to encompass a variety of entities based on an expenditure that is insubstantial in relation to their overall budgets.  Under these circumstances, Section 2(12)'s trigger appears obviously inconsistent with a legislative intent to include a major purpose requirement

Furthermore, when separately defining "issue committee," the drafters of Article XXVIII expressly incorporated a major purpose test.  *See* Colo. Const. Art. XXVIII, § 2(10)(a) (issue committee means any person or group of persons "that has a major purpose of supporting or opposing any ballot issue or ballot question").  The use of the phrase in this definition implies that the decision to leave it out of the definition of political committee was intentional.

Under these circumstances, I find that Section 2(12)'s language indicates that its drafters sought to impose obligations on any entity or group of individuals that expended more than $200 in support or opposition of a candidate, regardless of its major purpose.  *See ACLU of Nevada v. Heller*, 378 F.3d 979, 987 (9th Cir. 2004).  As a result, I may not rewrite Section 2(12) to conform with constitutional requirements.

30

*Davidson*, 236 F.3d at 1194.  Because Davidson has offered no other argument or evidence indicating that Article XXVIII's regulation of political committees meets exacting scrutiny, I find that the definition of political committee is unconstitutional, as applied to CRLC.[23]

This completes my discussion of the issues as I believe I have addressed all of the questions presented consistent with my judicial role of ruling no more broadly than necessary to determine the precise facts before me.  Because of the diverse and not always consistent or responsive presentations made by the parties, it may be that some issue has not been adequately resolved by this opinion and I will give the parties the opportunity to present any such issue hereafter.

Accordingly, it is ordered:

1.     Plaintiff's motion for summary judgment, (Docket # 63), is granted in part and denied in part;

2.     Defendant's motion for summary judgment, (Docket # 67), is granted in part and denied in part;

3.     Plaintiff's first, second, third, fourth and fifth claims, are granted to the extent that Sections 2(12), 3(4)(a), and Section 6(2) of Article XXVIII of the Colorado Constitution are declared unconstitutional as applied to the plaintiff for the reasons stated;

4.     Defendant Davidson and her successors are permanently enjoined from enforcing these provisions against the plaintiff as it currently is organized

---

[23]As a result, I need not address CRLC's argument that the provision is unconstitutionally vague.

and operates;

5.      Plaintiff's first claim that Section 6(1) of Article XXVIII of the Colorado Constitution is unconstitutional as applied to it is dismissed with prejudice;

6.      If either party determines that this decision has failed to resolve any issue presented that party shall file a notice of remaining issues to be determined no later than October 14, 2005; and

7.      Given the mixed results, each party shall bear its own costs and fees.

DATED at Denver, Colorado, on September 30, 2005.

BY THE COURT:


/s/ Walker D. Miller
United States District Judge